**William B. RICHARDSON, Appellant,**

**v.**

**UNITED STATES of America et al.**

**No. 19277.**

United States Court of Appeals, Third Circuit.

Argued June 25, 1971.

Submitted En Banc May 11, 1972.

Decided July 20, 1972.

William B. Richardson, pro se.

John F. Dienelt, Department of Justice, Washington, D. C., for appellees.

Argued June 25, 1971.

Before VAN DUSEN and MAX ROSENN, Circuit Judges, and KRAFT, District Judge.

Submitted En Banc May 11, 1972.

Present SEITZ, Chief Judge, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, MAX ROSENN, JAMES ROSEN, and HUNTER, Circuit Judges, and KRAFT, District Judge.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

 In contrast to the case frequently heard on appeal, in which the Government seeks an accounting from the taxpayer, here it is the taxpayer who seeks an accounting from the Govern-

ment. Appellant, acting *in propria persona*, complained that the Government's consolidated statement, entitled "Combined Statement of Receipts, Expenditures and Balances of the United States Government," fails to show monies received and expended by the Central Intelligence Agency (CIA). He alleged that the Central Intelligence Agency Act relieving the Secretary of the Treasury from publishing such figures was repugnant to the Constitution and void. He sought a writ of mandamus to compel the Secretary of the Treasury to publish an accounting of the receipts and expenditures of the CIA and to enjoin any further publication of the Combined Statement which did not reflect them. His application for a three judge court was denied by the district court which subsequently dismissed the complaint on grounds of standing and justiciability.[1]

We will vacate the order and remand.

After oral argument, this court deemed the issues raised by the case of sufficient importance to necessitate the appointment of amicus curiae, Professor

---

1. The procedural history of this case is confused. Appellant filed his complaint on January 8, 1970. Only eight days later his request for a three judge court was denied, and the case was ordered set down for assignment in the usual manner. Using hindsight, we can now see that the order of January 16, 1970, which presumably was based on a finding that there was no substantial constitutional question, Majuri v. United States, 431 F.2d 469, 472–473 (3d Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), largely determined appellant's case and made any further relevant litigation on the merits unlikely. Donovan v. Hayden Stone, Inc., 434 F.2d 619 (6th Cir. 1970). However, neither party nor the district judge so construed the action. On March 20, the Government filed a motion to dismiss and *on April 22 filed a motion to deny convening a three judge court.* On April 27 another district judge directed plaintiff to *file a brief on the questions of dismissal and a three judge court,* and on May 19, appellant *filed a motion to convene a three judge court.* On June 15 the hearing was held and on June 16 appellant's case was dismissed. A timely appeal was taken from that action. The January 16 order might have been appealable if it: (1) foreclosed future litigation and put him out of court, Idlewild Bon Voyage Liquor Corp. v. Rohan, 289 F.2d 426, 428 (2d Cir. 1961), modified on other grounds sub nom. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715 n. 2, 82 S.Ct. 1294, 8 L.Ed. 2d 794 (1962); (2) denied a preliminary injunction, Majuri v. United States, supra, or (3) dismissed the action at the same time, Jones v. Branigin, 433 F.2d 576, 579 (6th Cir. 1970), cert. denied, Jones v. Sullivan, 401 U.S. 977, 91 S.Ct. 1205, 28 L.Ed.2d 327 (1971). That order would clearly not have been appealable if there were other claims that had to be disposed of by the single judge district court to which the case had been assigned after denial of the three judge court. Cancel v. Wyman, 441 F.2d 553 (2d Cir. 1971); Lyons v. Davoren, 402 F.2d 890 (1st Cir. 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 861, 21 L.Ed.2d 774 (1969). This case is in between those two poles in that all parties believed there was further business for the district court, even though it is difficult for us to understand the basis for such a conclusion. In these circumstances we consider the order of January 16 interlocutory and not a final appealable order under 28 U.S.C. § 1291, and that the appeal from the order of June 16 properly raises the question of the denial of the three judge court. Sackett v. Beaman, 399 F.2d 884, 889 n. 6 (9th Cir. 1968). In any case, we note that a single judge court's actions after an improper denial of a three judge court are of no effect, for they are taken without jurisdiction. Lyons v. Davoren, supra, 402 F.2d at 892. Therefore, even though appellant did not raise the question of the propriety of the denial of the three judge court at an earlier stage, he can still raise the question here because it goes to the jurisdiction of the single judge court to enter its order of dismissal.

Appellant brought an earlier suit challenging the CIA's accounting, alleging jurisdiction under 28 U.S.C. § 1331. That suit was dismissed because he failed to show the matter in controversy exceeded the value of $10,000. Richardson v. Sokol, 409 F.2d 3 (3d Cir. 1969), cert. denied, 396 U.S. 949, 90 S.Ct. 379, 24 L.Ed. 2d 253 (1969). Because that decision was jurisdictional, he is not barred from raising the merits in this action. Etten v. Lovell Manufacturing Company, 225 F. 2d 844, 846 (3d Cir. 1955), cert. denied, 350 U.S. 966, 76 S.Ct. 435, 100 L.Ed. 839 (1956). 1B Moore's Federal Practice ¶ 0.405 [5].

Ralph S. Spritzer of the University of Pennsylvania Law School, formerly Acting Solicitor General of the United States. He has submitted a thoughtful brief to which all parties have responded.

## THE CONSTITUTIONAL AND STATUTORY CONTEXT

Because appellant sought to challenge the system by which the Federal Government accounts for funds spent by the Central Intelligence Agency, a brief explanation of that system is necessary to put his action in appropriate context.

The Federal Government's spending powers, enumerated in article I, section 8 of the Constitution, are regulated by article I, section 9, clause 7, which provides:

No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

In accordance with this mandate, all federal agencies except the CIA receive an annual specific appropriation from the Congress. 31 U.S.C. § 696. The Secretary of the Treasury then prepares an annual statement by "head of appropriation" for the use of the Executive, the Congress and the public reflecting how much each agency has spent during the previous fiscal year. 31 U.S.C. §§ 66b(a), 1029. Since there is no specific appropriation for the CIA, its receipts and expenditures are not listed in the document.

The Central Intelligence Agency Act of 1949, 63 Stat. 208, 50 U.S.C. § 403a et seq. (1970), established a unique procedure for funding the CIA. Section 403f(a) permits the CIA to transfer and receive funds from other agencies with the approval of the Bureau of the Budget (now Office of Management and Budget) "without regard to any provisions of law limiting or prohibiting transfers between appropriations." Once the money has been spent, the CIA need not disclose its functions or personnel, 50 U.S.C. § 403g, and:

[t]he sums made available to the Agency may be expended without regard to the provisions of law and regulations relating to the expenditure of Government funds; and for objects of a confidential extraordinary, or emergency nature, such expenditures to be accounted for solely on the certificate of the Director and every such certificate shall be deemed a sufficient voucher for the amount therein certified. 50 U.S.C. § 403j(b).

This procedure creates a two-step system for disbursement of the Treasury's monies to the CIA. First, Congress appropriates money to some other agency, and then that agency transfers the funds to the CIA. The only accurate accounting for the funds is the certificate rendered by the Director of the CIA, but it does not appear that this certificate or its contents are made available to the public. Presumably the money actually spent is reflected in the Treasury Department's annual statement as a disbursement by the original agency to which Congress made the appropriation, although it may not be reflected at all.

Appellant Richardson, a citizen and taxpayer residing in Greensburg, Pennsylvania, wrote the Treasury Department, inquiring about the annual expenditures of the CIA. He was informed by defendant Sokol, the Treasury officer in charge of the publication of the annual statement, that the Treasury Department did not receive information on the CIA because of the congressional determination that such information should not be made public. He further stated that neither he nor the defendant Secretary of the Treasury had access to the information appellant desired. There was no further administrative relief available.

Appellant then brought this action alleging that the appellees have a constitutional and statutory obligation to set forth an accurate accounting of the expenditures of the United States. He contended that the Central Intelligence

Agency Act of 1949, which creates an exception for the CIA, is repugnant to the Constitution because its prohibition against reporting the CIA's expenditures contravenes the mandate of article I, section 9, clause 7. He asked that a three judge court be convened to determine the constitutionality of the Central Intelligence Agency Act, and that a mandamus issue against the defendants requiring them to publish a financial statement which complies with the commands of the Constitution and the remaining acts of Congress.

Appellant also alleged that the constitutional duty to provide a regular account of receipts and expenditures of public money is one owed to the citizen and taxpayer, for its obvious design is to provide members of the electorate with information lying at the core of public accountability in a democratic society.

## JURISDICTION

Appellant alleges several grounds for jurisdiction, only one of which is proper.[2] It is the relatively new Mandamus and Venue Act, 28 U.S. C.A. § 1361, which states:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

The legislative history of the mandamus statute reveals that the statute's construction turns upon traditional mandamus law. Davis, Administrative Law Treatise (1970 Supplement) § 23.10. In order for mandamus to issue, a plaintiff must allege that an officer of the Government owes him a legal duty which is a specific, plain ministerial act "devoid of the exercise of judgment or discretion." Clackamas County, Or. v. McKay, 94 U.S.App.D.C. 108, 219 F.2d 479, 489 (1954). ICC v. New York, New Haven & Hartford R. R., 287 U.S. 178, 204, 53 S.Ct. 106, 77 L.Ed. 248 (1932), Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218, 50 S.Ct. 320, 74 L.Ed. 809 (1930), United States v. Walker, 409 F.2d 477, 481 (9th Cir. 1969). An act is ministerial only when its performance is positively commanded and so plainly prescribed as to be free from doubt. United States v. Walker, supra. Additionally, plaintiff must have exhausted all other available means of relief. Carter v. Seamans, 411 F.2d 767, 773 (5th Cir. 1969) cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).

What is the nature of the duty which appellant charges was breached? The duty alleged here arises under article I, section 9, clause 7 as implemented by the Congress under 31 U.S.C. §§ 66b(a) and 1029.[3] Appellant's position is that save for the existence of the Central Intelligence Agency Act, Congress would be required to appropriate money specifically for the CIA, and the Secretary of the Treasury would be required to give an accounting to the President, the Congress

2. None of the other bases of jurisdiction appellant alleges are applicable. Appellant may not predicate jurisdiction upon 28 U.S.C. § 1346(a) (2) since he has alleged no monetary damages. Blanc v. United States, 244 F.2d 708 (2d Cir.) cert. denied, 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d 79 (1957); Universal Transistor Products Corp. v. United States, 214 F. Supp. 486 (E.D.N.Y., 1963); nor can 5 U.S.C. §§ 701–704 form a basis for jurisdiction, since this circuit has held that the statute is not jurisdictional. Zimmerman v. United States, 422 F.2d 326 (3d Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970), and cases cited therein. Finally, 5 U.S.C. § 552(a) (3)

does not apply to "matters that are . . . (3) specifically exempted from disclosure by statute. . . . " 5 U.S.C. § 552(b) (3).

3. 31 U.S.C. § 1029 in pertinent part states: "It shall be the duty of the Secretary of the Treasury annually to lay before Congress, . . . an accurate, combined statement of the receipts and expenditures during the last preceding fiscal year of all public moneys, . . . designating the amount of the receipts, whenever practicable, by ports, district, and States, and the expenditures by each separate head of appropriation."

and the public for that agency's expenditures by that head of appropriation, as mandated by 31 U.S.C. § 1029.

The Government argues that no specific duty exists because the Congress has, by the Central Intelligence Agency Act, relieved the Secretary of the Treasury of the obligation to publish a statement pertaining to funds received and expended by the CIA. It also contends the Secretary cannot be under such an obligation because he does not possess the CIA's accounts.[4]

■■ We do not decide the constitutionality of the Central Intelligence Agency Act. However, for the purpose of determining whether mandamus will lie against him in the federal courts, an officer of the Government cannot deprive the court of jurisdiction to compel performance of an otherwise clear statutory duty by invoking the authority of what is challenged as an unconstitutional law. In re Ayers, 123 U.S. 443, 506, 8 S.Ct. 164, 31 L.Ed. 216 (1887); Board of Liquidation v. McComb, 92 U.S. 531, 541, 23 L.Ed. 623 (1875); National Association of Government Employees v. White, 135 U.S.App.D.C. 290, 418 F.2d 1126, 1129 (1969); cf. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 701–702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). As a practical matter, this rule avoids the multiplicitous litigation that would arise if a party were first required to litigate the constitutionality of a statute in a separate action and then later secure specific relief in another proceeding by mandamus. More importantly, if a law is unconstitutional, it is void and of no effect, and it cannot alter an otherwise valid obligation of a governmental officer to a citizen. To permit a defense based upon an unconstitutional law would prevent a plaintiff, such as appellant, from using the mandamus remedy to enforce his rights even though the Government has not otherwise shown the court a valid reason to deny the relief demanded. Such a defense would have the effect of sustaining the very statute which the court is asked to strike as unconstitutional.

■ Therefore, the Government may not rely on the CIA Statute to preclude jurisdiction of this mandamus action.

■ Except for the CIA Statute, the Secretary of the Treasury is under a clear command of Congress to account for all monies as they are actually expended by the different federal agencies. In fulfilling that duty, he has no discretion. 31 U.S.C. § 1029.

■ Nor are we persuaded by the Government's argument that the duty of the Secretary of the Treasury is not specifically owed to the appellant. The debates at the Constitutional convention in 1787 and the state ratifying conventions reveal that those who proposed the present language of the clause believed that the citizenry should receive some form of accounting from the Government.[5] The use of the word "published" in article I, section 9, clause 7 emphasizes that intention. Article II, section 3 requires the President "from time to time [to] give to the Congress Information on the State of the Union," and presumably the Framers could have utilized the same informal procedure with regard to the accounting if they had so wished. Instead, they

4. On remand, appellant may wish to consider whether any additional party should be added as a defendant.

5. When George Mason proposed the amendment that ultimately became the part of article I, section 9, clause 7 requiring the publication of a regular statement of receipts and expenditures, the only debate concerned the proper extent of the Government's obligation. At least inferentially, everyone seemed agreed on the need for some such statement. 2 Farrand, The Records of the Constitutional Convention (1927 ed.) 618–19. A year later during the Virginia Convention called to ratify the Constitution Mason and Madison defended the clause as the only way to assure some satisfactory reporting to the public. 3 Farrand 326. The same position was urged by James McHenry, a delegate to the Constitutional Convention, in the Maryland House of Delegates when they voted on ratification. 3 Farrand 149–50.

chose to have the statement "published," indicating that they wanted it to be more permanent and widely-circulated than the President's message. The connotation must be that the statement was for the benefit and education of the public as well as coordinate branches of the Government.

This constitutional obligation to account to the public is supported by the Congressional enactment of 31 U.S.C. § 66b'(a), which provides:

> The Secretary of the Treasury shall prepare such reports for the information of the President, the Congress, and *the public* as will present the results of the financial operations of the Government. . . . (emphasis supplied).

In furtherance of this general duty, Congress enacted 31 U.S.C. §§ 1027–1030,[6] which provide for various specific reports, including the Combined Statement of Receipts and Expenditures provided for in Section 1029.

Thus Congress' own language indicates that the Secretary's duty to present financial reports runs not only to the President and the Congress, but also to the public at large. If these reports are misleading and inadequate, there is no reason why Richardson, as a taxpayer, should not be able to require the appropriate executive officer to perform his obligations. The right of the taxpayer to receive reasonably complete reports of governmental expenditures is within the "zone of interest[s] . . . protected . . . by the statute . . . in question" and one for which he may suffer a cognizable injury. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153,

90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *accord*, Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

Finally, appellant has exhausted his avenues for administrative relief, he has no other remedy, and his only recourse now is judicial redress.

Appellant's case meets all the considerations required for mandamus. While mandamus should be construed liberally in cases charging a violation of a constitutional right, *cf*. Fifth Avenue Peace Parade Committee v. Hoover, 327 F.Supp. 238, 243 (S.D.N.Y.1971), even under principles of strict construction appellant has set forth a clear duty owed to him by the Secretary of the Treasury.

## STANDING

The appellant must also have sufficient standing in order to invoke the jurisdiction of a federal court.[6A] Article III, section 2 limits the judicial power of federal courts to consideration of "cases" or "controversies." Association of Data Processing Service Organizations, Inc. v. Camp, supra, 397 U.S. at 151, 90 S.Ct. 827, Flast v. Cohen, 392 U.S. 83, 101–102, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968). When a plaintiff does not have a stake in the outcome of the litigation to assure a sufficient adverseness in the proceedings to make it a true "case" or "controversy," we have no jurisdiction to entertain his request. Flast v. Cohen, supra, at 101–102, 88 S. Ct. 1942.

*Flast* established a two prong test to ascertain whether a plaintiff, such as appellant, who is a taxpayer, has the requisite adversary interest: (1) the plaintiff must establish a nexus between his status as a taxpayer and

---

6. 31 U.S.C. § 1028, dealing with the Post Office Department, was repealed August 12, 1970.

6A. In the normal procedure, once a district judge concludes that a three-judge court should be convened, it would appropriately consider, inter alia, the issue of standing. Since one of the grounds, however, for the dismissal of the case by the

district court was the lack of standing, that issue is properly before us on this appeal and, in the interest of judicial efficiency, a disposition of it may avoid the necessity of additional appeals to this court. *See* Port of New York Authority v. United States, 451 F.2d 783, 785, n. 4 (2d Cir. 1971), Crossen v. Breckenridge, 446 F.2d 833, 838 (6th Cir. 1971).

the challenged Government activity to give him a personal stake in the action; and (2) his claim must relate to a specific constitutional prohibition so that the issues may be sharpened and focused sufficiently for proper judicial resolution.

Although the district court did not specify its reasons for finding that appellant lacked standing, we assume that it applied *Flast* and found his case deficient thereunder. We cannot agree.

The decision in *Flast* breached the absolute barrier to taxpayer suits erected by an earlier Supreme Court decision. Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). *Frothingham* absolutely barred a taxpayer from objecting to a Government spending program as a violation of the tenth amendment and the due process clause of the fifth amendment, on the theory that taxpayer was affected by the law only to the extent that the public in general was affected by increased taxes. *Id.*, at 487, 43 S.Ct. 597. The Court feared a contrary decision would have opened the floodgates of litigation, and would have permitted people to litigate issues even though they did not have an adequate incentive for a vigorous prosecution because of the miniscule and remote nature of their interests. *Id.*

*Flast* did not completely overrule *Frothingham.* Chief Justice Warren's decision distinguished the latter case on the ground that a taxpayer could not properly object under the due process clause to general increases in his tax bill, but a taxpayer could object to any program provided under article I, section 8 that exceeded specific constitutional limitations on the taxing and spending powers of Congress. The Chief Justice believed that:

> Under such circumstances, we feel confident that the questions will be framed with the necessary specificity, that the issues will be contested with the

necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution. We lack that confidence in cases such as *Frothingham* where a taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System.

392 U.S. at 106, 88 S.Ct. at 1955.

A taxpayer could object to such outlays because there was a sufficient link between his status as a taxpayer and the act to assure a personal stake in the outcome of the controversy. That stake would provide " 'the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)." 392 U.S. at 99, 88 S.Ct. at 1952. Although the connection in *Flast* is concededly different from the one at issue here, both taxpayers have sufficient personal stake in the litigation. Plaintiffs in *Flast* contended they were being taxed to support an unconstitutional program that was in violation of the first amendment's establishment clause. Appellant argues that he has a right under the Constitution to "a Regular Statement and Account," but that he is being deprived of that right because of the Government's adherence to the allegedly unconstitutional Central Intelligence Agency Act.

The Government argues that *Flast* must be limited to challenges to appropriations. That view attempts to confine the case to its facts without regard to its reasoning. *Flast* is concerned with adverseness and specificity of issues for "standing," not spending *per se.*[7]

---

7. Velvel v. Nixon, 415 F.2d 236, 239 (10th Cir. 1969), cert. denied, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970), held that a plaintiff had no standing to challenge expenditures for the Vietnam War. They reasoned that Flast permitted challenges only to spending under the "general welfare" clause of article I, section

Even under the Government's argument, appellant's claim is still sufficient because it is integrally related to the appropriations process and the taxpayer's ability to challenge those appropriations. Although *Flast* recognizes standing of a taxpayer to challenge expenditures, how can a taxpayer make that challenge unless he knows how the money is being spent? Without accurate official information concerning the amount and purpose of the expenditures, there could be no basis for a taxpayer suit. It would be inconsistent to affirm the viability of taxpayers' suits on the one hand but take away a necessary precondition for those suits on the other.[8]

The Government's position is not sound to us and we must reject it. We believe that the nexus between a taxpayer and an allegedly unconstitutional act need not always be the appropriation and the spending of his money for an invalid purpose. The personal stake may come from any injury in fact even if it is not directly economic in nature. Association of Data Processing Service Organizations, Inc. v. Camp, supra, 397 U.S. at 154, 90 S.Ct. 827, 25 L.Ed.2d 184. A responsible and intelligent taxpayer and citizen, of course, wants to know how his tax money is being spent. Without this information he cannot intelligently follow the actions of the Congress or of the Executive. Nor can he properly fulfill his obligations as a member of the electorate. The Framers of the Constitution deemed fiscal information essential if the electorate was to exercise any

control over its representatives and meet their new responsibilities as citizens of the Republic;[9] and they mandated publication, although stated in general terms, of the Government's receipts and expenditures. Whatever the ultimate scope and extent of that obligation, its elimination generates a sufficient, adverse interest in a taxpayer.

In the second prong of the *Flast* test the Court inquired whether there was a specific section in the Constitution which operated to limit the Congress' taxing and spending powers. It noted that whether there are limitations other than the establishment clause would have to be decided by future litigation. 392 U.S. at 105, 88 S.Ct. 1942. Appellant's claim raises such a limitation. While article I, section 9, clause 7 is procedural in nature, and while the establishment clause is substantive in nature, both are nonetheless limitations on the taxing and spending power. It would be difficult to fashion a requirement more clearly conveying the framers' intention to regularize expenditures and to require public accountability.

Article I, section 9, clause 7 relates exclusively to the taxpayer's interest in the expenditure of public monies. It is unlike the due process clause of the fifth amendment and the tenth amendment, raised in *Frothingham*, which are designed to check a much broader range of possible abuses of power. Appellant does not raise any generalized complaints about the operation of his Government. He does not even complain that the CIA

---

8 and not to exercises under the specific enumerated powers, such as the right to provide for Armies and a Navy. We fail to see anything in Flast which requires a limitation of taxpayer suits to the general welfare clause. Suits challenging exercises of specific powers can certainly have the adverseness required, and there is nothing more in the Flast opinion which evinces a limitation of the taxpayer suit to certain types of subject matter.

8. The interest of a citizen to compel disclosure of this information without reference to his taxpayer's status might be an acceptable basis for this challenge. Atlee v. Laird, 339 F.Supp. 1347 (E.D.Pa.

1972); Reservists Committee to Stop War v. Laird, 323 F.Supp. 833, 840 (D.D. C.1971). But we need not decide that issue. Whatever the interest of a citizen in knowing where his Government has spent *its* money, the interest of a taxpayer in knowing where *his* money has gone is more compelling and direct. Chief Judge Seitz is of the opinion that this plaintiff does not have standing as a taxpayer. *See*, Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). However, he does agree that standing exists by reason of plaintiff's status as a voter and citizen.

9. Supra, note 5.

should not receive the money it presently spends, provided this money is properly appropriated and reported. He only seeks an accurate statement of account for the tax money extracted from him and spent. He relies on a specific constitutional provision to protect him from what he alleges is a legislative abuse of power, the non-accounting features of the Central Intelligence Agency Act.

We note that if appellant, as a citizen, voter and taxpayer, is not entitled to maintain an action such as this to enforce the dictate of article I, section 9, clause 7, of the United States Constitution that the Federal Government provide an accounting of the expenditure of all public money, then it is difficult to see how this requirement, which the framers of the Constitution considered vital to the proper functioning of our democratic republic, may be enforced at all. A decision to deny standing to the appellant in these circumstances would not seem consistent with the limited scope of the standing requirement. *See* Sierra Club v. Morton, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972):

> The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.

(Footnote omitted.)

McGowan v. Maryland, 366 U.S. 420, 429–430, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); N.A.A.C.P. v. Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958):

> The [standing] principle is not disrespected where constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court. See Barrows v. Jackson, 346 U.S. 249, 255–259, 73 S.Ct. 1031, 97 L.Ed. 1586; Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 183–187, 71 S.Ct. 624, 95 L.Ed. 817 (concurring opinion.)

Reservists Committee to Stop War v. Laird, 323 F.Supp. 833, 841 (D.D.C. 1971):

> It is not irrelevant [to the standing issue] to note that if these plaintiffs cannot obtain judicial review of defendants' action, then as a practical matter no one can.

(Footnote omitted.)

We have carefully avoided expressing any opinion on the merits of the appellant's claim. The complaint, however, contains sufficient allegations to give the appellant standing consistent with article III of the Constitution to invoke the court's jurisdiction for an adjudication on the merits.

## THREE JUDGE COURT

We next consider whether a three judge court should have been convened to hear appellant's complaint. 28 U.S.C. § 2282 [10] provides that an application for an injunction restraining the enforcement, operation or execution of any act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court unless heard by three judges.

The threshold question, therefore, is whether a complaint in which jurisdiction is grounded solely on the mandamus statute falls within the terms of this Act, independently of the additional prayer for injunctive relief which

---

10. 28 U.S.C. § 2282 reads:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title. [June 25, 1948, c. 646, 62 Stat. 968.]"

is stated in the complaint.[11] The Supreme Court has recently cautioned that the three judge court statute is not a " 'measure of broad social policy . .' [citation omitted]", Mitchell v. Donovan, 398 U.S. 427, 431, 90 S.Ct. 1763, 26 L. Ed.2d 378 (1970), and that the term "injunction" as used in 28 U.S.C. § 1253, and presumably in 28 U.S.C. § 2282, is to be narrowly construed. Id. A sufficiently narrow construction might serve then to bar a three judge court from hearing a mandamus action, but such a result would not be faithful to the intent of Congress. Section 2282 was enacted as a protective device to shield the Government from suits which might disrupt its operations. It was not intended for the convenience of the plaintiff. The legislative history of this section reveals that it, and its complement, § 2281, "were enacted to prevent a single federal judge from being able to paralyze totally the operation of an entire regulatory scheme, either state or federal by issuance of a broad injunctive order." [12] Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963).

This action, while based on the mandamus statute, in substance contemplates injunctive relief. It prays, inter alia, for a permanent injunction apparently in aid of the mandamus restraining publication of the Combined Statement of Receipts, Expenditures and Balances. Therefore, the action is for all practical purposes substantially similar to a mandatory injunction. In ascertaining the substance of the action we are required to look beyond the prayer for relief to the substantive allegations of the complaint. Majuri v. United States, 431 F.2d 469, 473 (3d Cir.), cert denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). Since the merger of law and equity under the Federal Rules Enabling Act of 1934 [13] and the adoption of Rule 2 of the Fed.R. of Civil Proc. (28 U.S. C.A. Rule 2) providing for only one form of action, there is little difference in substance between a mandamus and a mandatory injunction. Rolls-Royce, Inc. v. Stimson, 56 F.Supp. 22, 23 (D.D.C. 1944). The Supreme Court, in discussing the distinction drawn by the Court more than a half century before, stated that "[t]he distinction . . . between mandamus and a mandatory injunction seems formalistic in the present day and age," when rules of pleading are simplified "and, more importantly, before the merger of law and equity." Stern v. South Chester Tube Co., 390 U.S. 606, 609, 88 S.Ct. 1332, 1334, 20 L.Ed.2d 177 (1967). Just as injunctions are effective immediately and are punishable by contempt when disobeyed, so is mandamus. See Denver-Greeley Valley Water Users Association v. McNeil, 131 F.2d 67 (10th Cir. 1942). Even prior to the Enabling Act of 1934, the Supreme Court observed that although the remedy by mandamus is at law, its allowance was controlled by equitable principles. United States ex rel. Greathouse v. Dern, 289 U. S. 352, 359, 53 S.Ct. 614, 77 L.Ed. 1250 (1933).[14]

Unless we require that the instant action withstand the scrutiny of a three

---

11. Jurisdiction was not predicated on the prayer for injunctive relief since appellant did not comply with 28 U.S.C. § 1346 (a) (2). See f. n. 2, supra.

12. In extrapolating the substance of the Congressional debates, Mr. Justice Goldberg in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 155, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963), stated that "[r]epeatedly emphasized during the congressional debates on § 2282 were the heavy pecuniary costs of the unforeseen and debilitating interruptions in the administration of federal law which could be wrought by a single judge's order, and the great burdens entailed in coping with harassing actions brought one after another to challenge the operation of an entire statutory scheme, wherever jurisdiction over government officials could be acquired, until a judge was ultimately found who would grant the desired injunction. 81 Cong.Rec. 479–481, 2142–2143 (1937)."

13. 28 U.S.C. § 2072 (1970 Ed.) (48 Stat. 1064).

14. See also, Virginia Ry. v. System Federation, 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

judge court under § 2282, the whole purpose and policy of the act can be aborted by allowing the appellant to initially seek only a declaration of invalidity of the CIA statute in the mandamus action before a single judge. Based on such a decision which has immediate effect, he can mount a subsequent request, if necessary, for an ancillary injunction.[15] The ultimate effect of this action, if successful, will be to alter immediately the operation of critical features of the Central Intelligence Agency Act. Further, while based on the mandamus statute, this action contemplates injunctive relief in aid of the mandamus through restraining the publication of the Combined Statement of Receipts, Expenditures and Balances until it reflects the CIA's operations.

In these circumstances we hold that the district court was required to request the convening of a three judge court, unless it appears that the constitutional issue raised by appellant in this action is insubstantial.

■■■ Whether the issue is insubstantial must be determined by the allegations of the bill of complaint. Mosher v. City of Phoenix, 287 U.S. 29, 53 S.Ct. 67, 77 L.Ed. 148 (1932). No question for a three judge court exists if the allegations of the complaint reveal that the "question may be plainly insubstantial, either because it is 'obviously without merit' or because 'its unsoundness so clearly results from previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be

the subject of controversy.'" Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933). *See also*, Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Local Union No. 300, Amal. Meat Cutters & B. Work. of North America A.F.L.–C.I.O. v. McCulloch, 428 F.2d 396 (5th Cir. 1970).

■■ All parties to this litigation concede that there is no prior decision which directly controls the outcome of this case. Nevertheless, the Government would have us conclude that the question raised is plainly without merit. The face of the complaint reveals no such infirmity. The appellant seeks to void legislation allegedly repugnant to a specific constitutional mandate. The language of article I, section 9, clause 7 could be reasonably construed in appellant's favor, and there is nothing in prior decisions of the Supreme Court which forecloses such interpretation.

■■ An additional reason for dismissal of this action by the district court was that the question posed by appellant in his complaint was not justiciable because it was barred by the political question doctrine. We make no comment except to state that this issue is intertwined with the merits of the case and it must be left for development at the subsequent hearing before the three judge court.[16]

We conclude, therefore, that the complaint presents a constitutional cause of action raising a substantial question[17] which requires the convening of a three judge court.[18] On remand, the district

---

15. As Professor Currie points out, "since the injunction will be sought on the ground that the statute is unconstitutional, what remains for the three judges to decide?" 32 U.Chi.L.Rev. 1, 17 (1964).

16. *Cf.* Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); Continental Cas. Company v. Department of Highways State of La., 379 F.2d 673 (5th Cir. 1967); Schramm v. Oakes, 352 F.2d 143 (10th Cir. 1965); Sunray DX Oil Co. v. Federal Power Comm., 351 F. 2d 395, 400 (10th Cir. 1965); Fireman's Fund Ins. Co. v. Railway Express Agency, 253 F.2d 780 (6th Cir. 1958).

17. Chief Judge Seitz does not interpret the district court order of January 16, 1970, as a determination of the question of substantial federal question. Therefore, he views this issue as presently not before this Court and, on remand, would require the district court specifically to determine the existence of a substantial question before requesting that a three-judge court be convened.

18. Although appellant does not allege that his suit is a class action on behalf of all citizens, taxpayers, and people of the United States, his pro se complaint is replete with references to the effect of the

judge will take appropriate steps to request the Chief Judge of this Court to designate a statutory three-judge court. All remaining issues not resolved in this opinion shall be adjudicated by the court so convened.

The order of the district court will be vacated and the cause remanded for further proceedings consistent with this opinion.

ADAMS, Circuit Judge (dissenting).

The pivotal issue in this case, as I view it, is whether a citizen-taxpayer has the standing to obtain an injunction requiring the defendants to render an accounting of funds received and expended by the CIA.

Although there is considerable force to the position articulated by the majority, a review of the historical foundations for, and the development of, the standing doctrine leads ineluctably to the conclusion that the plaintiff here may not continue his action.[1] Accordingly, I respectfully dissent from the result reached by the majority.

The question of standing has confounded courts and commentators for many years. Although the Supreme Court has considered the problem in several different contexts, and many learned and provocative articles have discussed the Supreme Court decisions, the law is still quite murky. This is particularly so here, since this case is essentially one of first impression.

By now it is clear that a person may not invoke the judicial process to secure the relief he demands unless he has standing to do so. But what combination of circumstances operate to confer standing on one plaintiff and not another? The answer to that question does not admit to easy analysis.

## I. STANDING AND CONSTITUTIONAL REQUIREMENTS

The first point of reference in determining the parameters of standing is Article III, Section 2 of the Constitution, which provides, in part:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States

---

Secretary of the Treasury's allegedly unconstitutional failure to publish the receipts and expenditures of the CIA on "the People" and "Citizens" of the United States. See, e. g., paragraphs 16–c, 27, 36, 41, 45, 49 of the complaint. Because of the references and the intricate constitutional issues involved, we appointed amicus curiae to brief the issues raised by appellant's pro se complaint. For reasons best known to him, appellant opposed this effort by the court; indeed, on September 27, 1971, he attempted to secure review of his claims by the Supreme Court in advance of judgment, which review was denied. See Richardson v. United States, 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 542.

We recognize a litigant's right to proceed in a civil action pro se. See 28 U.S.C. § 1654. However, the federal courts have authority under article III of the United States Constitution to hear only cases presented in a proper adversary manner with the issues framed with the necessary specificity and the litigation appropriately pursued so that the "constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution." Flast v. Cohen, supra, at 106. Since this matter will now require the convening of a district court of three judges, of whom one must be a circuit judge, it "involves a serious drain upon the federal judicial manpower," Kesler v. Dept. of Public Safety, 369 U.S. 153, 156, 82 S.Ct. 807, 810, 7 L.Ed.2d 641 (1961), which we can ill afford. In the circumstances of this case, the proper presentation of the issues to that court would clearly be facilitated if appellant were assisted by a member of the federal bar, acting either as his counsel or as amicus curiae.

1. In view of the position we take here, it is not necessary to discuss the political question issue which so often lurks in the background of suits of this nature.

shall be a party;—to Controversies between two or more States;—between a State and Citizens of another State; —between Citizens of different States, —between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

A careful reading of Article III, Section 2 reveals that the existence of a case or controversy is mandatory before a federal court has jurisdiction, but the concept of standing is not mentioned at all. Nevertheless, it has been suggested that standing is a jurisdictional doctrine with a basis in Article III.[2] To determine whether a standing requirement is subsumed in the language of Article III, it is helpful to examine the state of the law at the time the Constitution was ratified.

Professor Raoul Berger has analyzed the English and American law extant in 1787, when the Constitution was adopted, as well as the remarks of the various draftsmen and proponents of the Constitution. Based on such a review, he concluded that courts were incorrect when they relied on the practice in 1787 to read standing into the case or controversy limitation because English practice in the Eighteenth century encouraged suits by "strangers to attack unauthorized action." Berger, Standing to Sue in Public Action: Is it a Constitutional Requirement? 78 Yale L.S. 816, 827 (1969) (footnotes omitted).

From his examination of the views of the Framers, Berger determined that they assumed that the traditional English remedies would be available within the language of Article III to "curb [Congressional] excesses, particularly in light of their desire to leave all channels open for attacks on congressional self-aggrandizement." *Id.*, at 829–830 (foot-notes omitted). Nevertheless, Professor Berger was frank to admit that the evidence supporting his view is "scanty" and that there may well be policy considerations which justify the standing doctrine.

Although the words "cases" and "controversies" and the phrase "of a judicial nature" (to use Madison's characterization) delimit the jurisdiction of the federal courts, they do not define nor are they synonymous with standing. In Tileston v. Ullman, 318 U.S. 44, 46, 63 S. Ct. 493, 494, 87 L.Ed 603 (1943), the Supreme Court stated that it would not determine "whether the record shows the existence of a genuine case or controversy" because "the appeal must be dismissed on the ground that appellant has no standing to litigate the constitutional question." And in Willing v. Chicago Auditorium Ass'n, 277 U.S. 274, 289, 48 S.Ct. 507, 509, 72 L.Ed. 880 (1928), the Supreme Court concluded that despite the plaintiff's standing, "still the proceeding is not a case or controversy within the meaning of Article 3  *  *."[3] Indeed, the Supreme Court has explained that "[a]part from the jurisdictional requirement, [the] Court has developed a complementary rule of self-restraint for its own governance  *   *   *", Barrows v. Jackson, 346 U.S. 249, 255, 73 S. Ct. 1031, 1034, 97 L.Ed. 1586 (1953), and that the standing requirements were "not principles ordained by the Constitution, but rather rules of practice  *   *   *", United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

## II. SUPREME COURT CASES

Accordingly, to determine accurately the boundaries of the doctrine of standing, reference must be made, not only to the test of the Constitution, but to the Supreme Court decisions which have discussed the issue.

2. *See* Adler v. Board of Educ., 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (Frankfurter, J., dissenting) ; Coleman v. Miller, 307 U.S. 433, 460–465, 59 S.Ct. 972, 985, 83 L.Ed. 1385 (1939) (Frankfurter, J., concurring).

3. *See also*, Socialist Labor Party v. Gilligan, 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972).

### 1. Frothingham v. Mellon

The first case in which the standing requirement was explored in any depth was Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). A taxpayer had sued to enjoin expenditures under the Maternity Act, alleging that "the effect of the appropriations complained of will be to increase the burden of future taxation and thereby take her property without due process of law." 262 U.S. at 486, 43 S.Ct. at 600. The Supreme Court affirmed lower court dismissals of the action, stating:

"The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained." *Id.*, at 487, 43 S.Ct. at 601.

After elucidating these policy considerations and the scope of the power of the judiciary to declare acts of Congress unconstitutional, the Supreme Court set forth the test of standing:

"The party who invokes the power [to declare an act of Congress unconstitutional] must be able to show not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.*, at 488, 43 S.Ct. at 601.

### 2. Significant Decisions Relating to Standing Subsequent to *Frothingham*

In Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937), the Supreme Court was faced with the issue of the standing of a citizen to challenge the constitutionality of the appointment and confirmation of an Associate Justice of the Supreme Court. In denying a motion for leave to file a petition for an order requiring the Justice to show cause why he should be permitted to serve, the Supreme Court stated:

"The motion papers disclose no interest upon the part of the petitioner other than that of a citizen and a member of the bar of this Court. That is insufficient. It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as a result of that action and it is not sufficient that he has merely a general interest common to all members of the public. * * * " *Id.* at 634, 58 S.Ct. at 1.[4]

The next significant case is Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). There, a physician sued in state court for a declaration that state statutes prohibiting the use of drugs or instruments to prevent conception and the rendering of assistance or counsel in their use are unconstitutional. The state court held the statutes were constitutional, and the Supreme Court, in a per curiam opinion, dismissed the appeal because of the appellant's lack of standing. The Court noted that Dr. Tileston was not asserting his own Constitu-

---

4. It is pertinent that the Supreme Court denied to leave to file the motion on the ground that the movant did not have standing rather than on the basis that it lacked original jurisdiction to entertain the petition.

tional rights, but those of his patients, who were not parties to the action.[5]

In Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), three organizations that had been branded as communist by the Attorney General sued for declaratory and injunctive relief, alleging that they had suffered both pecuniary damage and a chilling effect on their First Amendment rights as a result of the defamation. In considering whether the lower courts had properly dismissed the actions, the Supreme Court, speaking through Mr. Justice Burton, held:

> "Finally, the standing of the petitioners to bring these suits is clear. The touchstone to justiciability is injury to a legally protected right and the right of a bona fide charitable organization to carry on its work, free from defamatory statements of the kind discussed, is such a right." Id. at 140–141, 71 S.Ct. at 632 (footnotes omitted).

Taxpayers in Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L. Ed. 475 (1952), sought a declaration in a state court that a statute providing for the reading of the Bible in the New Jersey public schools was unconstitutional. Although the case was clouded by elements of mootness (one of the plaintiffs was no longer in school), it turned squarely on the issue of standing, which was cast by the Supreme Court in terms of "case or controversy."[6] As to the facets of the case surviving the mootness question, the Court noted that "[n]o information is given as to what kind of taxes are paid by appellants and there is no averment that the Bible reading increases any tax they do pay or that as taxpayers they are, will,

or possibly can be out of pocket because of it." 342 U.S. at 433, 72 S.Ct. at 397. The Supreme Court's holding, dismissing the appeal, relied, at least in terms of the language employed, on the fact that no money was at stake. Id., at 434–435, 72 S.Ct. 394.

One of the questions presented to the Supreme Court in Chicago v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), was whether an intervenor had standing to appeal a judgment of a court of appeals. There, various railroads servicing Chicago sought to employ a new motor carrier to transfer passengers between stations. The new carrier refused to apply for a certificate required by a city ordinance, and when threatened with arrest, sued in federal court to invalidate the ordinance. The old carrier, Parmelee Transportation Co., was granted permission to intervene. Although the district court dismissed the complaint, the court of appeals reversed, and both the city and the old carrier appealed. In considering whether Parmelee had standing to secure review of the judgment, the Supreme Court stated: "It is enough, for purposes of standing, that we have an actual controversy before us in which Parmelee has a direct and substantial personal interest in the outcome." Id. at 83, 78 S.Ct. at 1067. See also, Norman's on the Waterfront, Inc. v. Wheatley, 444 F. 2d 1011, 1012–1014 (3d Cir. 1971).

Another aspect of standing was addressed by the Supreme Court in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). There, the state had sued the NAACP for violation of its foreign corporation registration statute, and moved for discovery of the NAACP's membership list. Although the defendant was willing to apply for

---

5. In Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), patients and a doctor both asserted that the state statutes were unconstitutional. The Supreme Court refused to decide the case, on the ground of lack of a justiciable controversy, because the complaints did not allege a threat of prosecution, because the state had initiated only one such prosecu-

tion in 82 years (to test the constitutionality of the statute), and because the doctor's constraint in not providing contraceptive devices was not reasonably related to a fear of prosecution. The issue of standing was not discussed in the main opinion.

6. But see Barrows v. Jackson, supra.

registration, it would not disclose its general membership. In an appeal from a contempt citation, the Court held that the Association had standing to assert the Constitutional rights of its members. The Court explained:

> "To limit the breadth of issues which must be dealt with in particular litigation, this Court has generally insisted that parties rely only on constitutional rights which are personal to themselves. * * * This rule is related to the broader doctrine that constitutional adjudication should, where possible, be avoided. * * * The principle is not disrespected where constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court. * * *
>
> " * * * Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical." *Id.* at 459, 78 S.Ct. at 1170 (citations omitted).

Thus, the NAACP's standing was predicated on the factual peculiarity of the case: to require the members to assert their rights not to have their names divulged would have revealed their names.[7] It is also significant that the NAACP was already in court as a defendant when it raised the issue.

McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960),

presented two standing issues to the Supreme Court for resolution: (1) whether employees of a store who had been fined for violations of Sunday sales laws had standing to raise "free exercise" constitutional questions; and (2) whether the same persons could assert "establishment clause" rights as a defense to their prosecutions. With regard to the "free exercise question," the Court noted that appellants alleged only personal economic injury, not infringement of their religious freedoms, and held that they therefore had no standing to raise the issue of religious freedom.[8] As to the "establishment clause" issue, the Court stated:

> "Appellants here concededly have suffered direct economic injury, allegedly due to the imposition on them of the tenets of the Christian religion. We find that, in these circumstances, these appellants have standing to complain that the statutes are laws respecting an establishment of religion." *Id.* at 430–431, 81 S.Ct. at 1108 (footnote omitted).

The Court distinguished *Doremus, supra,* on the ground that the complainants there failed to show direct and particular economic detriment. As in NAACP v. Alabama, *supra,* the defendants in *McGowan* were already in court, and had not sued as plaintiffs to raise the underlying substantive constitutional issue.[9]

3. Baker v. Carr (Formulation of the test)

---

7. The members of the NAACP would have had standing in their own behalf because disclosure of the membership list would have had a direct impact on each member. The Court also noted that the Association had standing in its own right because of the injury it would suffer as a result of the action being taken against it by the state. *See also* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

8. Because there were no allegations that the statutes infringed upon the beliefs of the store's patrons, the court did not decide if standing existed under Pierce v. Society of the Sisters, 268 U.S. 510, 535–536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). But the Court did point out that such

persons were not without effective ways to assert their rights, citing NAACP v. Alabama, *supra;* Barrows v. Jackson, *supra,* thus implying that they would have standing in an appropriate case.

9. *See also,* Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). There, the Supreme Court distinguished Tileston v. Ullman, *supra,* on the ground that the doctor in *Griswold* was a defendant as opposed to a plaintiff, as in *Tileston.* The Court stated: "Certainly the accessory should have standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be a crime." 381 U.S. at 481, 85 S.Ct. at 1680.

Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), presented still another facet of the standing problem. There, qualified voters from certain Tennessee counties brought an individual and class action to invalidate the apportionment of the state general assembly. The Supreme Court first formulated the question:

> "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?" *Id.* at 204, 82 S.Ct. at 703.

In answering the question affirmatively, the Supreme Court noted that Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), "squarely held that voters who allege facts showing disadvantage to themselves have standing to sue." 369 U.S. at 206, 82 S.Ct. at 704.[10] The injury asserted by the plaintiffs in Baker v. Carr was that the apportionment scheme then in effect "disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality *vis-a-vis* voters in irrationally favored counties." *Id.* at 207–208, 82 S.Ct. at 705. The Court continued:

> " 'If such impairment does produce a legally cognizable injury, they are among those who have sustained it. They are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes,' Coleman

v. Miller, 307 U.S. 433 at 438, 59 S.Ct. 972, 83 L.Ed. 1385, not merely a claim of 'the right, possessed by every citizen, to require that the Government be administered according to law. * * *' Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 66 L.Ed. 499 * * *." *Id.* at 208, 82 S.Ct. at 705.[11]

Thus, the key to the decision in Baker v. Carr was the injury suffered by a voter whose vote was diluted by the unequal apportionment of election districts.[12]

The Court was able to reach the merits of the equal protection claim, over the objection that to do so would be to decide a political question, because plaintiffs are entitled to relief from discrimination despite the fact that the discrimination relates to political rights. *Id.* at 209, 82 S.Ct. 691.

### 4. School District of Abington Township, Pa. v. Schempp

Apparently, *Doremus, supra,* was overruled *sub-silentio* by School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). *Schempp* was a taxpayer suit, brought in federal court, to enjoin the enforcement of a state Bible-reading statute. Chief Judge Biggs, writing for a three-judge court, held that the statute was violative of the First Amendment, that the school children had standing "similar to that of the minor plaintiffs in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 * * *", and that the parents had standing "as the natural guardians of their children, having an immediate and

---

10. *Colegrove* was not a standing case, as such. The decision turned on the judgment that reapportionment of Congressional Districts was a political question. 328 U.S. at 552, 556, 66 S.Ct. 1198.

11. Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499 (1921), was a citizen-taxpayer suit in equity for a declaration that the Nineteenth Amendment was improperly ratified by the states, that a law enforcing the amendment, then pending in Congress, was unconstitutional; for an injunction prohibiting the Secretary of State from issuing a proclamation of adoption of the amendment;

and for an injunction forbidding the Attorney General from enforcing the proposed act. The Supreme Court denied plaintiff standing because any wrongful acts of the named officials would be directed against election officers, not citizens, and that in any event, the plaintiff was a citizen of a state which had already amended its own constitution to permit women to vote and had ratified the amendment.

12. *See* Neal, Baker v. Carr; Politics in Search of Law, the Supreme Court Review, the University of Chicago Law School, 252, 274 (1962).

direct interest in their spiritual and religious development * * *." 177 F. Supp. 398 (E.D.Pa.1959).[13] The Supreme Court affirmed the district court on the merits, but did not discuss the standing question at all.

### 5. Flast v. Cohen (Frothingham reconsidered)

Eventually, every discussion of standing must come to grips with Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Whether one wishes to read that case narrowly or expansively, it must still be recognized that the issue there was "whether the *Frothingham* barrier should be lowered when a taxpayer attacks a federal statute on the ground that it violates the Establishment and Free Exercise Clauses of the First Amendment." *Id.* at 85, 88 S.Ct. at 1944. The Court undertook to re-examine *Frothingham* because that opinion was unclear whether the standing requirement there announced was a matter of policy or constitutional doctrine. After analyzing the issue in terms of justiciability, the Supreme Court concluded that there was "no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs." *Id.* at 101, 88 S.Ct. at 1953. Thus, the constitutional basis for *Frothingham,* if it ever existed, was undermined.

Nevertheless, the Supreme Court did not go so far in *Flast* as to suggest that the concept of standing, based upon policy considerations, was no longer viable. Rather, the Court stated the issue, albeit in general terms, "whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Id.* at 102, 88 S.Ct. at 1953.[14] Turning then to the case before it, a challenge to an appropriations measure, the Court set forth two rules governing its decision.

The first rule, or sub-test, is a part of the general standing requirement dealing with nexus, quoted above. In order to maintain a suit, a "taxpayer must establish a logical link between that status and the type of legislative enactment attacked." *Id.* "Thus," the Supreme Court explained, "a taxpayer will be a proper party to allege the unconstitutionality *only* of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Id.,* (emphasis added).

The statement seems to make clear that taxpayer suits will be entertained only to enjoin expenditures under Article I, Section 8 of the Constitution, and that taxpayers as taxpayers will not have standing under any other circumstances.

The second part of the test set forth in *Flast* is that "the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." *Id.* The Court explained:

> "Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.*

But, this sub-test is not too meaningful when applied to taxpayer suits not challenging appropriations, and therefore can properly apply only to suits seeking to enjoin the expenditure of appropriated moneys.

13. An appeal was taken to the Supreme Court, and the matter was remanded to consider the effect of an amendment to the statute, 364 U.S. 298, 81 S.Ct. 268, 5 L.Ed.2d 89 (1960). On remand, the district court adopted the position it previously assumed with regard to standing. 201 F.Supp. 815, 818 (E.D.Pa.1962).

14. The Supreme Court used as a paradigm the dichotomy formulated in its opinion in McGowan v. Maryland, *supra.*

Thus, the general rule of taxpayer standing promulgated by *Flast*, as applied to cases not involving appropriations, if such a generalization is valid at all, is that in order to satisfy the requirement, a taxpayer must show: (1) the connection between his status and the enactment, and (2) the connection between his status and the right he alleged was infringed. In other words, does the enactment challenged affect the taxpayer as a taxpayer? And, if so, does it infringe upon a specific constitutional right possessed by that taxpayer as an individual? [15]

As might be expected, *Flast* received extensive coverage by the commentators. The Harvard Supreme Court Review concluded:

"[t]he *Flast* criteria provide a workable scheme for ascertaining when federal taxpayers should be permitted to sue even though not congressionally designated as proper parties to represent the public interest, but the criteria are not constitutionally compelled. The only constitutional requirement spelled out in *Flast* is that litigants seeking judicial review of congressional action, but not alleging an injury to a legally protected interest, must present some rationale distinguishing their personal interest from that of the general citizenry; any special injury rationale would seem to fulfill this requirement." The Supreme Court, 1967 Term, 82 Harv.L. Rev. 63, 230 (1968).

Apparently, the author of the Harvard note analyzed *Flast* in Hohfeldian terms,

i. e., the plaintiff must show that some right of his was violated and that he was injured thereby, although the approach of the majority opinion was not so cast.

Professor Jaffe did employ Hohfeldian theory [16] in his analysis of *Flast*. He reasoned that courts, including the Supreme Court, have heard suits initiated by non-Hohfeldian plaintiffs—those not seeking a determination that they possess a right, privilege, immunity or power—and that the requirement of a Hohfeldian plaintiff is no longer justifiable from a policy point of view. *See*, Jaffe, The Citizen as Litigant in Public Actions: The non-Hohfeldian Or Ideological Plaintiff, 116 U.Pa.L.Rev. 1033 (1968).

Professor Kenneth Culp Davis criticized the reasoning of Flast v. Cohen. Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601 (1968). First, he argued that although nonconstitutional issues were before the Supreme Court, it decided neither the merits nor the standing question in terms of those issues. But more fundamentally, he controverted the statement by Mr. Justice Harlan that:

"This Court has previously held that individual litigants have standing to represent the public interest, despite their lack of economic or other personal interests, if Congress has appropriately authorized such suits." Flast v. Cohen, 392 U.S. at 131, 88 S.Ct. at 1969.

Rather, Professor Davis asserted:

"Even though the law of standing is so cluttered and confused that almost ev-

---

15. Mr. Justice Stewart, concurring in *Flast*, stated that he understood the case "to hold only that a federal taxpayer has standing to assert that a specific expenditure of federal funds violates the Establishment Clause of the First Amendment. * * *" 392 U.S. at 114, 88 S.Ct. at 1960. He considered that the Court otherwise reaffirmed the holding of *Frothingham*. Mr. Justice Fortas, also concurring, asserted: "The status of taxpayer should not be accepted as a launching pad for an attack upon any target other than legislation affecting the Establishment

Clause." 392 U.S. at 116, 88 S.Ct. at 1961.

16. See Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16 (1913).
   Jaffe's article was written while the *Flast* case was pending in the Supreme Court. But Jaffe's analysis was not adopted by the majority decision in *Flast*, and it might be contended that the Court impliedly rejected it. *See* dissenting opinion of Justice Harlan, 392 U.S. at 119, 88 S.Ct. 1942.

ery proposition has some exception, *the federal courts have consistently adhered to one major proposition, without exception: One who has no interest of his own at stake always lacks standing.*" 35 U.Chi.L.Rev. at 617.[16a]

Professors Lockhart, Kamisar and Choper suggest that *Flast* and *Frothingham* are distinguishable because Mrs. Frothingham was, in reality, attempting to assert her state's interest in maintaining its legislative prerogatives whereas Mrs. Flast was vindicating her personal constitutional right not to be taxed for the establishment or support of a religious institution. W. Lockhart, & Kamisar & J. Choper, Constitutional Law 65–66 (1970). This distinction implies that Mrs. Frothingham's right not to be taxed to support a federal program in derogation of a state's police power was not a meaningful personal right. It is apparently derived from the three holdings of *Frothingham* and the companion case of Massachusetts v. Mellon:

(1) The state's contention that the federal act in issue was an attempt to destroy its sovereignty was a non-justiciable political question because the state was under no compulsion to accept the benefits of the act;

(2) The state did not have *parens patrie* standing to assert the rights of a citizen against the United States because in a federal-state dispute, it is the United States and not any given state that stands in *parens patrie* with its citizens; and

(3) The increased burden of taxation is a public rather than a private concern, and thus a citizen would not suffer any direct personal injury from an increase in taxation.

Similarly, a citizen would suffer no direct personal injury if the federal government usurps the sovereignty of a state. On the other hand, a citizen apparently does suffer a sufficiently personal injury to confer standing when he is taxed to support a religious institution, since each citizen has a personal stake in ensuring that the Government not establish a religion.

Lockhart, Kamisar and Choper go on to suggest that the taxpayer standing limitation is a practical measure to prevent undue interference with sensitive federal appropriations, especially in the fields of defense and foreign aid, but that such a limitation is not appropriate in the domestic arena of the Establishment Clause. *See* W. Lockhart, Y. Kamisar & J. Choper, *supra*, at 68.

6. Cases after *Flast* (resurrection of the "case" or "controversy" Constitutional Consideration)

The Supreme Court's next foray into the morass may be found in a pair of cases decided in 1970: Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192. These cases involved the issue of standing to review administrative regulations.[17]

---

16a. The unsatisfactory aspect of the federal law of standing is, according to Professor Davis, its inconsistency. However, the observation is put forth that: "The law of standing need not be either a 'complicated specialty of federal jurisdiction,' as the Supreme Court has called it, or a mass of confused logic-chopping about bewildering technicality. It can be much simpler and much clearer than it is. All that is necessary is to make some firm policy choices and then to apply them consistently." *Id.* at 628 (footnotes omitted). Professor Davis then states a series of propositions, some affirmative and some negative, to govern the decision whether to grant standing in a particular case. The net effect of Professor Davis' propositions would be to ease the standing requirement necessary to attack legislative enactments.

Raoul Berger also criticized *Flast*, but from an historical basis. He examined the state of the law at the time the Constitution was adopted and concluded that our founding fathers may have contemplated that all citizens would have standing, in the constitutional sense, to attack congressional usurpations. *See, Berger, supra,* at 829–301.

17. These are not the first cases on the subject, but rather, represent the current cul-

*Data Processing Service* begins with the observations that: "Generalizations about standing to sue are largely worthless as such." 397 U.S. at 151, 90 S.Ct. at 829. Nevertheless, the Supreme Court stated that one generalization was necessary: "the question of standing in the federal courts is to be considered in the framework of Article III * * *." *Id.* This holds true whether the suit is by a taxpayer, as in *Flast,* or by a competitor, as in *Data Processing.* Mr. Justice Douglas, quoting from *Flast,* noted that the Article III requirement is met when the suit is "presented in an adversary context." He added that in a competitor's suit, the "first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Id.* at 152, 90 S.Ct. at 829.[18] Second, where a party challenges regulatory actions, he will have standing to sue if he is arguably within the zone of interests protected by the statute. *Id.* at 155–156, 90 S.Ct. 827. If these two tests are met, a plaintiff will have standing to seek judicial review of an administrative determination only if Congress has not specifically forbidden such review. *Id.* at 156–158, 90 S.Ct. 827. *Barlow* restated and reinforced these tests. 397 U.S. at 164–165, 90 S.Ct. 832.[19]

### 7. Sierra Club v. Morton (The Personal Stake Requirement)

In Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Supreme Court considered whether a private organization had standing under the Administrative Procedure Act, 5 U.S.C. § 702 (1970), to obtain judicial review of a decision of the United States Forest Service allowing development of part of a National Forest and National Game Refuge as a resort. Early in the opinion, the Supreme Court noted:

"Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a 'personal' stake in the outcome of the controversy, Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663, as to ensure 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947." 405 U.S. at 732, 92 S.Ct. at 1364.

Justice Stewart, speaking for the majority, stated that *Data Processing* and *Barlow* held that standing existed under the A.P.A. where the plaintiffs "alleged that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." *Id.* at 733, 92 S.Ct. at 1365.

It is clear that the "injury in fact" need not be economic injury, yet it must be an injury suffered by the plaintiff and not the public at large. *See id.* at

mination of the law of standing in the administrative law field as it has evolved over an extesnive period. *See, e. g.,* Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1967); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Tennessee Power Co. v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939). *See also,* Chicago v. Atchison, T. & S. F. R. Co., *supra.*

18. The Court recognized that injury to non-economic interests reflecting " 'aesthetic, conservational, and recreational' * * * values" as well as a "spiritual

stake in First Amendment values [may be] sufficient to give standing * * *." 397 U.S. at 154, 90 S.Ct. at 830, citing Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608, 616 (2d Cir. 1965); Office of Communication of United Church of Christ v. FCC, 123 U.S.App. D.C. 328, 359 F.2d 994, 1000–1006 (1966); School District of Abington Tp., Pa. v. Schempp, *supra.*

19. *See also,* Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970).

734, 92 S.Ct. 1365.[20] Only after a party establishes his personal standing may he litigate issues affecting the public interest. *Id.* at 739, 92 S.Ct. 1368.

The policy reasons underpinning the *Sierra Club* holding, as expressed by the majority decision, indicate that the Supreme Court is not yet willing to allow "any individual citizen" to challenge executive or congressional action.

Mr. Justice Stewart went on to state: "The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." *Id.* at 740, 92 S.Ct. at 1368. (Footnote omitted.)

Because of the importance of environmental quality, Mr. Justice Blackmun would make an exception to this requirement. Id. at 741, 92 S.Ct. 1369 (Dissenting opinion).

The above catalog of authorities does not exhaust the list of cases in which standing was an issue. For example, as long ago as 1900 the Supreme Court insisted that only parties with an interest in the land could maintain an action bottomed on title to the land. *See* Tyler v. Judges of the Court of Registration, 179 U.S. 405, 21 S.Ct. 206, 45 L.Ed. 252. Standing requirements were somewhat relaxed in Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915), to allow an employee to assert his employer's right to be free of an unconstitutional law restricting the employment of aliens. However, the plaintiff there was an alien employee, asserting rights under the Equal Protection Clause. In 1917, a Caucasian sued a Negro for specific performance of a real-estate contract; the Negro asserted a local ordinance restricting Negro residency; and the Caucasian was permitted to challenge the validity of the ordinance. Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); *accord,* Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). And in Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L. Ed. 1070 (1925), private and parochial schools were allowed to argue that a state statute violated the rights of parents and guardians because the plaintiff schools themselves had property rights directly affected by the statute.

In Ashwander v. TVA, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), a preferred stockholder of a private power company sued to prevent the company from entering into a contract with the TVA on the ground that the TVA was unconstitutional. Although the Supreme Court reached the merits of the case, Justice Brandeis, joined by Justices Stone, Roberts and Cardozo dissented on the ground Ashwander did not have standing since he had not demonstrated that either he or his company would sustain loss because of the contract. And three years later, in a similar situation, a majority of the Supreme Court held that the plaintiff did not have standing to attack the constitutionality of the TVA because it suffered no loss that could be remedied since it did not have a right to be free of competition. Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939).[21]

---

20. The dismissal of the complaint was affirmed because the Sierra Club had failed to allege that either it or its members would be directly affected by the change in use to which the land would be subject.

21. Professor Bickel advances the rationalization that if a plaintiff suffers no injury either to a material right or one created by the law or the Constitution, then for a court to reach the merits of the controversy would be for it to render an advisory opinion. He concludes that this would be especially true in a taxpayer suit where the statute in question has no particular impact on the taxpayer. A. Bickel, The Least Dangerous Branch 121 (1962).

This past term, the Supreme Court, in Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154, 1972, in deciding not to entertain the complaint of a citizen regarding claimed surveillance by Army authorities, stated:

"The decisions in these cases fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights. At the same time, however, these decisions have in no way eroded the 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action . . .' Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937)." 408 U.S. at 13, 92 S.Ct. at 2325.

### III. LOWER COURT CASES ON STANDING

There are some recent court of appeals and district court decisions which, although not binding upon us, shed some light on the problem. In Velvel v. Nixon, 415 F.2d 236 (10th Cir. 1969), a taxpayer-citizen sued for a declaration that the Vietnam War was unconstitutional and for an order enjoining further American involvement in Vietnam. The district court dismissed the action and the court of appeals affirmed, holding that the plaintiff had not demonstrated the requisite personal stake in the outcome. The crux of the decision was that Flast was inapplicable because the plaintiff was not challenging a congressional expenditure under Article I, Section 8, and that even if Flast were applicable, no specific constitutional limitation had been violated.

In Richardson v. Kennedy, 313 F.Supp. 1282 (W.D.Pa.1970) (three-judge court), aff'd, 401 U.S. 901, 91 S.Ct. 868, 27 L. Ed.2d 800 (1971), plaintiff challenged as unconstitutional the Congressional pay raise effected by the Postal Revenue and Federal Salary Act of 1967, 2 U.S.C. §§ 351–361 (1970). The Court dismissed the complaint on three grounds. First, the appropriation sought to be enjoined did not arise as in Flast under Article I, Section 8, but rather Article I, Section 6. Second, Article I, Section 6 "will not qualify as a Constitutional provision restricting the taxing and spending power * * *." 313 F.Supp. at 1286. Third, the plaintiff did not "possess the necessary personal stake in the outcome of this controversy and therefore lacks standing to maintain this action." Id. (footnote omitted).

Reservists Committee to Stop War v. Laird, 323 F.Supp. 833 (D.D.C.1971), reached an opposite result.[22] The plaintiffs, the Committee and individual reservists, sought an injunction ordering the executive to "take steps that will eliminate any office inconsistent with the constitutional mandate" of Article I, Section 6, clause 2, forbidding "Members of either House" from holding "any civil Office under the Authority of the United States." Specifically, it was alleged that 117 Senators and Representatives held commissions in the various military reserves, contrary to the Constitution. The court held that plaintiffs lacked standing as reservists, since they were unable to prove any direct injury, and as taxpayers, since they were not suing to enforce a limitation on the taxing and spending power of Congress. Nevertheless, Judge Gesell found that plaintiffs did have standing to sue as citizens for several reasons: (1) the Constitution was addressed "to the potential for undue influence rather than to its realization," 323 F.Supp. at 840; (2) the Constitutional clause sought to be enforced was a "precise self-operative provision," id.; (3) the Constitution intended to protect the interest shared by all citizens in maintaining independence among the branches of government, id. at 341; and (4) the adverse interests of the parties left no doubt as to the ex-

---

**22.** The order of the district court is presently pending appeal.

istence of a "case or controversy," *id.* Also important to the court was that if these plaintiffs could not obtain judicial review, "then as a practical matter no one can." *Id.*[23]

The standing of a citizen to attack the constitutionality of the Vietnam War was found to exist in another recent case. Atlee v. Laird, 339 F.Supp. 1347 (E.D.Pa.1972). In *Atlee* the district court found that standing under the specific test of *Flast* was precluded because the warmaking clause was not a "specific limitation on the manner in which Congress could make expenditures." However, the court did find standing under the more general tests of *Flast, Data Processing Service,* and *Barlow* in that the plaintiffs had alleged personal economic injury resulting from the inflation and recession caused by war spending. The court also found standing because of the non-economic aspects of the war, *viz.,* the toll of human life, the threat to the personal safety and security of all the citizens, and the diversion of available funds from domestic needs to the war effort.[24]

## IV. ANALYSIS OF DECISIONS

The principles to be distilled from all the many cases dealing with standing do not lead to the formulation of an easy set of guidelines by which standing may be determined, and indeed, Mr. Justice Douglas' comment in *Data Processing Service,* quoted *supra,* 397 U.S. at 151, 90 S.Ct. 829, is particularly apt. The problem is compounded, not only by the various contexts in which the cases arose, but by their inconsistency with regard to their theoretical basis.[25] Nevertheless, some helpful guidelines do emerge from the mass of decisions.

The threshold rule in determining standing to litigate is that the party raising the issue must have been personally and directly injured or threatened with immediate injury by a violation of a statutory or constitutional right designed to protect that party. *See, e. g.,* Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); Sierra Club v. Morton, *supra;* Association of Data Processing Service Organizations v. Camp, *supra;* Barlow v. Camp, *supra.*

This element, however, is subject to certain exceptions or limitations. Thus, standing to litigate questions concerning the Establishment Clause might be found in the absence of direct injury.[26] *See e. g.,* School District of Abington Township, Pa. v. Schempp, *supra;* McGowan v. Maryland, *supra.* And slight injury may suffice to meet the test where other constitutional rights of paramount importance are at stake. *See* Baker v. Carr, *supra;* Sierra Club v. Morton, *supra* (Blackmun, J., dissenting); *cf.,* Flast v. Cohen, *supra.*

Another factor which becomes apparent is that standing requirements may be eased where the party asserting the constitutional right is a defendant in a criminal or civil action. *See* Griswold v. Connecticut, *supra;* NAACP v. Alabama, *supra.* The rationale for this approach appears to be three-fold; first, a defendant has been injured or threaten-

---

23. It is not without some significance that the district judge declined to grant injunctive relief and granted only a declaratory judgment. To our knowledge, the declaratory relief has never been implemented, which raises one of the problems that confronts a court in this type of a case.

24. Although Chief Judge Joseph Lord did not analyze the various cases involving suits by citizens attacking allegedly unconstitutional action, he did indicate that Atlee was alleging personal economic injury.

25. Of course it must be recognized that the doctrine of standing is properly a device by which courts avoid constitutional litigation when they deem it unnecessary or inappropriate to decide the underlying question. Thus, the inconsistencies can be explained in part by the fact that each standing decision is colored by unstated and perhaps undefinable premises.

26. The personal injury requirement is also relaxed in most cases involving free speech or expression. *See* Note The Void for Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 102–103 (1960).

ed with injury because of the impact of the proceedings against him; second, a defendant is involuntarily in court, and thus the policy of discouraging litigation will not be furthered by preventing him from asserting the right; and third, for a court to convict or impose liability by virtue of an unconstitutional statute or action would be affirmatively to commit an unconstitutional act.

Next, suits designed to interfere with the orderly operation of the Government, particularly with regard to taxation and appropriations, will not be entertained except in narrowly-defined circumstances. *See* Flast v. Cohen, *supra*; Frothingham v. Mellon, *supra*; W. Lockhart, Y. Kamisar & J. Choper 68, *supra*.

Closely related to this principle is the admonition that a citizen who suffers equally with all other citizens will not be heard to raise generalized grievances about the conduct of the Government. *See* Sierra Club v. Morton, *supra*; Flast v. Cohen, *supra*; Baker v. Carr, *supra*; Ex parte Levitt, *supra*; Frothingham v. Mellon, *supra*; Fairchild v. Hughes, *supra*.

One district court found an exception to this precept where the constitutional provision asserted was addressed to the potential for abuse, and the provision was precise and self-operative. Reservists Committee to Stop War v. Laird, *supra*.

Finally, an important although not determinative factor in deciding whether standing exists is the availability of other modes of judicial review. *See* NAACP v. Alabama, *supra*; Barrows v. Jackson, *supra*; Pierce v. Society of the Sisters, *supra*; Buchanan v. Warley, *supra*; Truax v. Raich, *supra*. *But see* Colgrove v. Green, *supra*.

In the quest for standing in this litigation, another analysis of the major Supreme Court cases may be undertaken. If one accepts the limitations read into

Flast v. Cohen by Justices Stewart and Fortas, then Frothingham v. Mellon represents an absolute bar to predicating standing on plaintiff's status as a "taxpayer," absent allegations of expenditures in violation of the Establishment Clause, notwithstanding the somewhat broader language employed by the Court in *Flast*.

Thus, our inquiry here may be narrowly focused upon cases where "citizen" standing was asserted. This search can be further circumscribed by eliminating from consideration as inapposite cases brought under the Administrative Procedure Act, where Congress has authorized or at least not forbidden suits,[27] and cases in which standing was conferred upon *defendants*, where as noted above other factors apply.

By this process of elimination, there is left for consideration those cases dealing with the standing of "citizens" who have sued a Government official for the vindication of a constitutional right personal to such "citizen." These cases fall into two categories. In some, the Supreme Court reached the merits despite the lack of a substantial, direct, tangible personal injury. In others, the standing barrier was breached only after the plaintiff demonstrated that he, personally, had actually been harmed in some regard.

Representative of the first group of cases are Baker v. Carr and School District of Abington Township, Pa. v. Schempp. In Baker v. Carr, the basis of standing was that the constitutional right asserted—the integrity of the electoral process—was considered of such paramount importance that the deprivation of the right by dilution of voting strength through unequal apportionment was deemed a sufficient injury to permit the merits to be adjudicated. Similarly, the consideration that led the Court in *Schempp* to by-pass the standing problem was the high value placed upon the

---

27. Although Richardson claimed entitlement to relief under the A.P.A., this claim is without merit, since the Act confers standing only upon persons "aggrieved by agency action within the meaning of a relevant statute * * *." 5 U.S.C. § 702.

rights encompassed by the Establishment Clause.

Cases representative of the second category—where plaintiff showed or failed to show harm in some regard—are Fairchild v. Hughes, Ex parte Levitt, Chicago v. Atchison, T. & S.F.R. Co., Laird v. Tatum, and Moose Lodge No. 107 v. Irvis. In *Fairchild* the Court stated that a citizen had no standing to challenge the adoption of the Nineteenth Amendment because he could not demonstrate any particular injury he would suffer that would not be shared equally by all citizens. *Levitt* held that a citizen did not have standing to challenge the appointment and confirmation of a Supreme Court Justice. And in *Atchison*, Parmelee was permitted to intervene because of the economic harm suffered by it. In *Tatum*, citizens attacking surveillance techniques employed by the Army were held not to have standing because there was no indication that their First Amendment rights were chilled by the Army's practices. On the other hand, the Supreme Court permitted the parties to litigate at least some of the issues in *Irvis* because the plaintiff demonstrated personal impact or injury. *Irvis* is an excellant example of this dichotomy. There, the Court held that the plaintiff did not have standing to litigate questions involving the membership qualifications of the Moose Lodge because he had not even attempted to become a member, but that he did have standing to raise the issues surrounding the Lodge's guest policies since he was refused service while a guest.

Thus, through the use of this case-by-case evaluation, two criteria appear to be critical. Is the constitutional right asserted of such paramount importance so as to obviate the need to allege and prove direct, personal impact which is individualized as distinguished from an impact shared by every member of the body politic? If not, does the plaintiff allege a direct personal injury or impact caused by the violation of the asserted constitutional right?

## V. APPLICATION OF PRINCIPLES TO THE PRESENT CASE

In this case, actual application of the precepts deduced from the various Supreme Court cases parallels the analysis undertaken above, and the same two questions must still be resolved.

We begin with the proposition that Richardson is a plaintiff, not a defendant, and therefore cases conferring standing upon defendants are somewhat inapplicable. Because expenditures are attacked, *Flast* and *Frothingham* would appear to create a barrier, at least insofar as Richardson's standing as a taxpayer is concerned. Third, the Administrative Procedure Act cases are not controlling because the challenged executive action is in full compliance with a Congressional enactment and there have been no administrative procedural irregularities pleaded. Finally, the plaintiff has not alleged that the Congressional and Executive action at issue has violated First Amendment rights or other rights previously assigned a position of paramount importance.

Accordingly, we are left with the questions of the relative importance of the asserted constitutional right and the nature of the injury suffered by the plaintiff.

1. Historical Background of Article I, Section 9, Clause 7.

The debates regarding Article I, Section 9, Clause 7, the provision relied upon by plaintiff here, that occurred during the Constitutional Convention, shed light on the relative importance of that stipulation. An authority on the debates, Max Farrand, indicates that the discussion began with a statement by George Mason that "he did not conceive that the receipts and expenditures of the public money ought ever to be concealed. The people, he affirmed, had a right to know the expenditures of their money." 3 Farrand, The Records of the Federal Convention of 1787, at 326 (Rev. ed. 1966). James Madison disagreed only with Mason's proposal of a fixed report-

ing period, stating that reports based on short periods:

"would not be so full and connected as would be necessary for a thorough comprehension of them and detection of any errors. But by giving them [the reporting officials] an opportunity of publishing them from time to time, as might be found easy and convenient, they would be more full and satisfactory to the public, and would be sufficiently frequent." *Id.*

Rufus King objected to a full accounting on the ground that it would be "impracticable" to report "every minute shilling." 2 Farrand 618.[28]

The argument that the duty to report the accounting runs to the public is based on a comparison of Article I, Section 9, Clause 7 with Article II, Section 3. The language of Article I, Section 9, Clause 7 mandates that "a regular Statement and Account * * * shall be published * * * ", whereas Article II, Section 3 requires that the President "shall from time to time give to the Congress information of the State of the Union * * ". Thus, the impact of the distinction between "shall be published" and "shall from time to time give to the Congress" becomes apparent. Furthermore, the Articles of Confederation, drafted by many of the same persons as the Constitution, required only that Congress inform the states of its indebtedness, as opposed to the requirement of publication of the receipt and expenditures of all public money. *Compare* U.S.Const. Art. I, § 9, cl. 7 *with* Articles of Confederation, Art. IX, ¶ 5 (requiring Congress to account to the states for "sums of money * * * borrowed or emitted").

2. Evaluation of Article I, Section 9, Clause 7 with respect to other constitutional provisions.

Nevertheless, without denigrating the importance of Article I, Section 9, Clause 7, it would appear fair to conclude that it does not rise to the paramount stature of other constitutional provisions, such as those contained in the Bill of Rights. History records that many of the early colonists came to the New World to avoid the inhibitions upon personal religious freedom which attend the establishment of a state church. Indeed, there is some doubt whether the Constitution would have been ratified at all without the promises of the draftsmen that it would be soon amended to provide for certain basic rights. It is no coincidence that the first clause of the First Amendment prohibits the establishment of a national religion.

The right of a citizen to have his vote count equally with those of other citizens is also basic to our system of Government. The "one-man-one-vote" principle is the very embodiment of the concept of a participatory democracy in which each citizen is considered the equal of every other.

Accordingly, the constitutional right presently asserted by the plaintiff would not appear to be, at least in the context of this case and at this point in the development of our history, of such preeminent importance that the traditional requirements of standing should be waived.

3. The nature of the injury.

Since the right asserted would appear to be not a paramount one, it is necessary to determine whether plaintiff has suffered a personal injury sufficient to enable him to litigate the underlying issue. Although the debates in the Constitutional Convention might suggest that the right conferred by Article I, Section 9, Clause 7 runs to each citizen individually, they also demonstrate that the Clause imposes a duty to report to the public generally. Because Richardson did not and could not allege that either he alone or some identifiable class of citizens has suffered an injury not

---

**28.** The importance of the accounting is emphasized when article I, Section 9, Clause 7, requiring disclosure of all receipts and expenditures, is compared with Article I, Section 5, Clause 3, which allows each House of Congress to except from publication in its journal "such Parts as may in their Judgment require Secrecy."

suffered by everyone else, the conclusion would appear to follow that "he has merely a general interest common to all members of the public," [29] and therefore is not endowed with standing to litigate this matter.

I recognize that if the view expressed herein were to be adopted by the majority, it would be difficult to perceive how a citizen would be able to litigate the constitutional provision asserted by Richardson. Nevertheless, the cumulative effect of the many cases denying standing in the face of this objection is persuasive authority that this consideration is not sufficient by itself, within the contours of this suit, to confer standing upon plaintiff.[30] *See, e. g.,* Frothingham v. Mellon, *supra;* Fairchild v. Hughes, *supra;* Ex parte Levitt, *supra;* Coleman v. Miller, *supra* (Frankfurter, J., concurring).

Indeed, to create a deviation on this basis would risk impairment of a vital rule by the disintegrating erosion of particular exceptions.

## VI. CONCLUSION

In recent years, the Supreme Court has had several opportunities to expand the concept of standing, but has declined to do so. I have serious reservations whether we ought to take this step in the absence of Congressional authorization or in the absence of some significant development in our national life clearly indicating the necessity for such movement.

The Constitution has been likened to a device designed "to be adapted to the various crises of human affairs." McCulloch v. Maryland, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819). Constitutional litigation is the vehicle by which the Constitution can be interpreted, when necessary, to insure that the practice of government comports with the ideals of the governed. The system works best and provides a solid basis for future adjustments when changes are brought about slowly in response to real need for the change.

The rule of self-restraint did not develop suddenly, and it is not a manifestation of the timorousness of judges. Rather, it reflects an approach to constitutional litigation designed to avoid division among the three branches of Government in their task of social problem-solving. Before the Constitution was adopted, Alexander Hamilton, in the 78th Federalist, recognized that the judiciary was the one branch without power to enforce its will on the other branches, and that it "must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." The most respected jurists throughout our history have realized that rash decision-making by the courts could lead to the disregard of the judiciary as a decision-maker.

From Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803), to O'Brien v. Brown, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), major constitutional crises threatening important government concepts have been averted by the application of discreet judicial techniques of self-restraint. When courts exercise forbearance, they act, to use the parlance of our electronic age, as filter circuits, dampening and smoothing political oscillations, rather than as amplifiers, magnifying them out of proportion. It is this smoothing process that has enabled us, in the long run, to maintain our democratic ideals in a troubled world.

---

29. Ex parte Levitt, *supra.*

30. The impact of this impediment is substantially blunted when it is considered that there are a number of constitutional provisions that cannot be litigated for other reasons. For example, the duty of a state to extradite a prisoner cannot be judicially enforced, Kentucky v. Dennison, 24 How. 66, 16 L.Ed. 717; the duty to ensure that laws are faithfully executed may not be judicially compelled, Mississippi v. Johnson, 4 Wall. 475; and violations of the guaranty of a republican form of government in the states is not assailable in the courts, Pacific States Telephone & Telegraph Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377.

But to allow the tool of constitutional litigation to be employed at the behest of every disgruntled citizen would dull its working edge and weaken its effectiveness. It is for this reason that the Supreme Court has adopted a rule of "self-restraint," and it is for this reason that we should not be quick to abandon that precept.

Accordingly, I would affirm the judgment of the district court dismissing this action.

Judges ALDISERT and HUNTER join in this opinion.